**FILED**

AUG 0 4 2014

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

MARK DUNN,                          *          CIV 13-3004-RAL
                                    *
        Plaintiff,                  *
                                    *
                                    *      OPINION AND ORDER
    vs.                             *      GRANTING IN PART AND
                                    *        DENYING IN PART
LYMAN SCHOOL DISTRICT 42-1,         *      DEFENDANT'S MOTION FOR
                                    *        SUMMARY JUDGMENT
        Defendant.                  *
                                    *

## I. Introduction

Plaintiff Mark Dunn (Dunn) filed an Amended Complaint against Defendant Lyman
School District (School District) alleging violations of the Age Discrimination in Employment
Act (ADEA), 29 U.S.C. § 621 *et seq.*, (Count I), a breach of fiduciary duty and duty of loyalty
(Count II), and intentional infliction of emotional distress (Count III). Doc. 22. The School
District moved for summary judgment, Doc. 41, which Dunn opposed, Doc. 51. For the reasons
explained below, this Court denies the School District's motion for summary judgment on Count
I, but grants the motion on Counts II and III.

## II. Facts

This Court takes the facts in the light most favorable to Dunn as the non-moving party
and draws the facts primarily from Plaintiff's Objections to Defendant's Statement of Undisputed
Material Facts and Counter Statements of Material Facts. Doc. 50. Dunn began working as a
guidance counselor for the School District in 1995. Doc. 50 at ¶ 1. He remained in this position
until May 2010, when he voluntarily retired with the hope of being rehired the following year
so that he could collect retirement benefits and a salary. Doc. 50 at ¶ 2. The School District paid

Dunn for his accumulated sick leave and gave him his severance. Doc. 50 at ¶ 4; Doc. 41-25. The School District made no guarantee it would rehire Dunn. Doc. 50 at ¶¶ 3, 5. In June 2010, the School Board (Board) voted to rehire Dunn for the 2010-2011 school year, with only one Board member voting in opposition. Doc. 50 at ¶ 6. Dunn was sixty years old when he was rehired. Doc. 50 at ¶ 8. Because South Dakota regulations required a ninety-day break in service between Dunn's retirement and his return to employment, Dunn could not begin working for the School District until September 1, 2010. Doc. 50 at ¶¶ 9-10.

Because of reduced tax collection caused in part by a recession, the state of South Dakota in 2011 cut its education funding by approximately fifteen percent. Doc. 50 at ¶¶ 11, 17; Doc. 41-4 at 5; Doc. 41-9 at 4; Doc. 41-10 at 2. As a result, Bruce Carrier, the School District superintendent at that time, proposed a reduction in force of certain positions to the Board. Doc. 50 at ¶¶ 12-14, 17. Those identified in the proposed reduction in force—Dunn, Renee Miller, and Beth Bacon—were three of the older employees in the School District. Doc. 50 at ¶ 21.[1] The proposed reduction in force never occurred, however, and the School District offered Dunn a new contract for the 2011-2012 school year. Doc. 50 at ¶¶ 16, 21, 25. Dunn's 2011-2012 contract did not include compensation for work before or after the school year. Doc. 50 at ¶ 25. Nor did the 2011-2012 contract include the extra-duty assignment of National Honors Society (NHS) advisor and the corresponding compensation. Doc. 50 at ¶ 25. Dunn had been the NHS advisor for several years, but the position became unpaid in 2011. Doc. 50 at ¶¶ 18, 19. Marsha

---

[1]According to an affidavit filed by the School District's business manager Renelle Uthe, in March 2011 when the School District was considering the proposed reduction in force, there were eleven employees older than Dunn, thirty-seven employees older than Beth Bacon, and five employees older than Renee Miller. Doc. 55-4.

Hullinger, a School District secretary, assumed the position for the 2011-2012 school year after agreeing to do so without compensation. Doc. 50 at ¶¶ 18-19. The School District reinstated pay for the position for the 2012-2013 school year. Doc. 50 at ¶ 18.

Doug Eppard (Eppard), a School District employee since 1997 who was most recently the high school principal, became superintendent for the School District in the summer of 2011. Doc. 50 at ¶¶ 28, 30; Doc. 41-12 at 2. Cooper Garnos (Garnos), another School District employee, became principal of the high school and elementary school in 2011. Doc. 50 at ¶¶ 29, 30. During the 2011-2012 school year, Dunn worked with college students Andrea Diehm (Diehm) and Brittany Reuman, nee Fuhrman, (Brittany) while they completed guidance counseling internships with the School District. Doc. 50 at ¶¶ 31-32. Brittany performed her internship during the fall semester while Diehm performed a practicum during the fall semester and an internship during the spring semester. Doc. 50 at ¶¶ 31-32. Around Christmas of 2011, Brittany became engaged to Drew Reuman (Drew), the son of Board President Marlene Reuman (Reuman). Doc. 50 at ¶¶ 89, 90. Brittany had been dating Drew when she applied for the internship and once they became engaged, she hoped to find permanent employment near Lyman where Drew worked. Doc. 50 at ¶¶ 89-90. Both Brittany and Diehm received their masters degrees in the spring of 2012. Doc. 50 at ¶ 33.

Eppard testified in his deposition that during the 2011-2012 school year, he spoke with his wife, Principal Julie Eppard, and Garnos about Dunn's job performance. Doc. 50 at ¶¶ 36-37; Doc. 41-12 at 4. When pressed for specifics, however, Eppard had trouble recalling the details of the conversations and the exact dates they took place. Doc. 50 at ¶¶ 36-37; Doc. 41-12 at 4-5. Similarly, although Garnos testified that he spoke with Eppard on several occasions about Dunn's

3

lack of a connection with students and his level of commitment and community involvement, Garnos was unable to name any particular students with whom Dunn had difficulty connecting. Doc. 50 at ¶ 38; Doc. 52-5 at 5, 10. Garnos further testified that he had not communicated his concerns to Dunn either verbally or in writing and that Dunn had never refused to do something Garnos asked of him. Doc. 50 at ¶ 38; Doc. 52-5 at 4-5, 9.

In January 2012, Eppard and the Board discussed not renewing Dunn's contract. Doc. 50 at ¶ 53; Doc. 41-12 at 13. Eppard testified that during these discussions, several Board members expressed concern that Dunn was not a very good guidance counselor. Doc. 50 at ¶¶ 45, 46; Doc. 41-12 at 13-14. Board member Meta Halverson testified that the Board discussed looking for someone who would be more helpful to the students. Doc. 50 at ¶¶ 46-48; Doc. 41-10 at 4-5. Eppard told the Board that there were two interns in the community who would be very good candidates. Doc. 50 at ¶ 53; Doc. 41-12 at 14. Eppard did not recall any Board member asking about Dunn's age, his receipt of retirement benefits, or whether he was going to retire. Doc. 50 at ¶ 53; 41-12 at 14; see also Doc. 41-11 at 2. At some point in either early 2012 or before, however, the Board did discuss that Dunn had retired in 2010 and was no longer a tenured employee. Doc. 50 at ¶ 53; Doc. 41-10 at 4.

In February 2012, Eppard called Dunn into his office and asked him whether he "was planning to retire that year or what [his] plans were." Doc. 50 at ¶ 40; Doc. 41-4 at 3; Doc. 52-2 at 18-19. Dunn responded that he planned to continue working for the School District rather than retiring and inquired why Eppard wanted to know. Doc. 50 at ¶ 40; Doc. 41-4 at 3; Doc. 52-2 at 18. Eppard explained that there was a "50/50" chance that Dunn's contract would not be renewed and reminded Dunn that he had lost his tenure when he retired and was then rehired.

4

Doc. 50 at ¶ 40; Doc. 41-4 at 3; Doc. 52-2 at 18.  According to Dunn, Eppard also informed Dunn that the possible nonrenewal of his contract had "nothing to do with [Dunn's] job performance, that [Dunn] had done everything [he] had always been asked to do and done it well, but that [Eppard] had two good, young counseling interns living in the [D]istrict that [Eppard] did not want to lose to another district."[2] Doc. 50 at ¶¶ 42, 45; Doc. 41-4 at 3; see also Doc. 41-4 at 4.  Eppard never called Dunn "old," mentioned Dunn's age, or told Dunn that the School District needed someone "much younger," however.  Doc. 50 at ¶¶ 41, 42; Doc. 41-4 at 3-4, 12, 17.

According to the "Age Discrimination Fact Summary" Dunn filed, Eppard met with Dunn in early March 2012 to inform Dunn that he would be recommending nonrenewal of Dunn's contract at the Board meeting on March 12, 2012, because it was "time for a change at Lyman." Doc. 52-18; Doc. 50 at ¶¶ 42, 74; Doc. 41-4 at 4.  Eppard told Dunn that he could resign at that time because it "would be better for [Dunn] to do that." Doc. 50 at ¶ 74; Doc. 52-18.  Eppard in fact recommended at the March 12, 2012 meeting that the Board not renew Dunn's contract. Doc. 50 at ¶ 43; Doc. 41-12 at 15.  Although the Board had the ultimate authority to make staffing decisions, it considered Eppard's recommendations and typically relied on his statements concerning a teacher's performance. Doc. 50 at ¶ 43; Doc. 41-10 at 2; Doc. 52-2 at 2; Doc. 52-7 at 2, 4.  Neither Halverson nor Reuman independently investigated Dunn's performance. Doc. 50 at ¶ 45; Doc. 41-10 at 2; Doc. 52-7 at 2.  The Board then voted not to offer Dunn a contract for the following year. Doc. 50 at ¶ 44. Six out of the nine members on the Board in 2010 when

---

[2]Eppard has a different version of this conversation, Doc. 52-2 at 18-19, but this Court in ruling on a motion for summary judgment must take the facts in the light most favorable to Dunn as the nonmovant. EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 686 (8th Cir. 2012).

Dunn was rehired were also on the Board in 2012 when Dunn's contract was nonrenewed. Doc. 50 at ¶ 54. The same Board members who voted to rehire Dunn in 2010 voted to nonrenew his contract in 2012. Doc. 50 at ¶ 55.

On March 13, 2012, Dunn was given written notice that the Board had not renewed his contract. Doc. 50 at ¶ 58. The notice did not give any reason for the nonrenewal. Doc. 41-19. That same day, the School District advertised for the guidance counselor position. Doc. 50 at ¶ 60. On March 14, 2012, Brittany applied for the guidance counselor position. Doc. 50 at ¶ 92. A hiring committee consisting of Eppard, Julie Eppard, Garnos, and School District counselor Julie Muirhead (Muirhead) interviewed three applicants for the position, including Diehm and Brittany. Doc. 50 at ¶ 61; Doc. 41-12 at 18. The hiring committee asked standard questions during each interview and ranked the applicants thereafter. Doc. 50 at ¶ 62. On April 9, 2012, the Board voted to offer the position of guidance counselor and assistant girls' basketball coach to Brittany. Doc. 50 at ¶ 63. Reuman, the future mother-in-law of Brittany, had participated in the decision to nonrenew Dunn's contract. Doc. 50 at ¶ 91; Doc. 52-7 at 4. Reuman removed herself from the process of hiring a guidance counselor by not discussing the applicants with other Board members or Brittany, leaving the Board meeting when the applicants were discussed, and abstaining from the vote. Doc. 50 at ¶ 64.

On May 17, 2012, the day for staff to turn in their keys, Dunn asked Eppard for copies of all his performance evaluations from his personnel file. Doc. 50 at ¶ 86; Doc. 52-16 at 3. Although Dunn was entitled to his performance evaluations under School District policy, Eppard was unable to locate them. Doc. 50 at ¶¶ 85, 87; Doc. 52-2 at 12. Later that day, Garnos came to Dunn's office and stated that he wanted to review Dunn's performance evaluation with him.

6

Doc. 50 at ¶ 87; Doc. 52-16 at 3; Doc. 55-3 at 4.  Dunn refused to sign the performance evaluation because he believed that it was not on the appropriate form and did not comply with the Negotiated Agreement.  Doc. 50 at ¶ 80; Doc. 52-16 at 3.  Garnos observed that Dunn was visibly upset.  Doc. 50 at ¶ 103; Doc. 52-5 at 6.  Thereafter, Dunn met with Garnos, Eppard, and School District business manager Renelle Uthe.  Doc. 50 at ¶ 82.  Uthe was there as a witness and she signed Dunn's performance evaluation attesting that he had refused to sign it himself. Doc. 50 at ¶ 82; Doc. 52-25; Doc. 55-1.

In June 2012, Dunn filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging age discrimination against the School District.  Doc. 41-22. Eppard responded with a letter to the EEOC explaining the reasons he felt were pertinent to the nonrenewal of Dunn's contract.  Doc. 50 at ¶ 109; Doc. 41-23.  The EEOC dismissed Dunn's complaint, stating that although it was "unable to conclude that the information obtained establishe[d] violations of the statutes[,]" it was "not certify[ing] that the [School District was] in compliance with the statutes."  Doc. 41-24.

## III. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  On summary judgment, courts view "the evidence and the inferences that may be reasonably drawn from the evidence in the light most

favorable to the nonmoving party." EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 686 (8th Cir. 2012) (quoting Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011)). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). Although Dunn asserts that there is a "long-standing Eighth Circuit rule that summary judgment should seldom be used in employment-discrimination cases[,]" Doc. 51 at 9, the United States Court of Appeals for the Eighth Circuit held in an en banc decision that there is no "'discrimination case' exception to the application of summary judgment[.]" Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). Thus, this Court applies the same summary judgment standard to discrimination cases as it does to all others.

## IV. Discussion

### A. ADEA

The ADEA forbids discrimination against employees, age forty and over, because of their age. 29 U.S.C. §§ 623(a)(1), 631(a). To prove his claim under the ADEA, Dunn must show by a preponderance of the evidence that age was the "but-for" cause of the adverse employment action. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009) ("[T]he plaintiff [in an ADEA case] retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action."); Buehrle v. City of O'Fallon, 695 F.3d 807, 813 (8th Cir. 2012) ("Under the ADEA standard, a plaintiff must 'establish that age was the "but-for" cause of the employer's adverse action.'" (quoting Gross, 557 U.S. at 177)). Dunn may have his ADEA claim survive summary judgment "either by providing direct evidence of discrimination or by creating

8

an inference of unlawful discrimination through the McDonnell Douglas [Corp. v. Green, 411 U.S. 792 (1973)] analysis."[3] Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 953 (8th Cir. 2012). Dunn contends that he has direct evidence of discrimination and, alternatively, that he can satisfy the McDonnell Douglas test.

### 1. Direct Evidence

The Eighth Circuit has explained that direct evidence in this context "is not the converse of circumstantial evidence . . . [but] is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." Bone, 686 F.3d at 953 (quoting Torgerson, 643 F.3d at 1044) (internal quotation marks omitted). This evidence "must be 'strong' and must 'clearly point[] to the presence of an illegal motive' for the adverse action." Id. (quoting Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)). Direct evidence "may include evidence of actions or remarks of the employer that reflect a discriminatory attitude, comments which demonstrate a discriminatory animus in the decisional process, or comments uttered by individuals closely involved in employment decisions." King v. United States, 553 F.3d 1156, 1161 (8th Cir. 2009) (quoting King v. Hardesty, 517 F.3d 1049, 1058 (8th Cir. 2008)) (internal quotation marks omitted). However, "stray remarks in the workplace, statements by nondecisionmakers, and statements by decisionmakers unrelated to the decisional process do not constitute direct evidence." Id. at

---

[3]The Supreme Court explained in Gross that it has not definitively decided whether the McDonnell Douglas framework applies in ADEA cases. Gross, 557 U.S. at 175 n.2. Nevertheless, the Eighth Circuit has continued to apply the framework in ADEA cases. See Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507, 515 (8th Cir. 2011) (upholding the continued applicability of McDonnell Douglas after Gross).

1160-61 (quoting Schierhoff v. GlaxoSmithKline Consumer Healthcare, LP, 444 F.3d 961, 966

(8th Cir. 2006)) (internal quotation marks omitted).

Dunn argues that Reuman's testimony concerning a 2010 Board meeting constitutes direct

evidence that age discrimination motivated the Board's decision to nonrenew his contract in

2012. Specifically, he points to the following deposition testimony from Reuman:

> **Reuman:** At that time when [Dunn] retired we accepted his
> retirement. And then we discussed whether we were going to
> rehire him back. And that was not all in the same meeting.
> **Dunn's Counsel:** Okay. So maybe you could just help me
> understand when those meetings occurred. And what was
> discussed at each meeting.
> **Reuman:** Well, the first meeting he retired. And then we
> discussed--and he wanted to do the retire rehire. So we discussed
> whether we wanted to do that. And that is when we decided that
> we would advertise for the position. Then the next meeting and
> I can't tell you if it was the next month or two months later that
> we had--we had advertised for the position, and like I told you,
> the one applicant that we were interested withdrew her
> application. So then we discussed when we would--then the next
> meeting we discussed we would hire him back.
> **Dunn's Counsel:** Okay. And in that first meeting which board
> members said what regarding Mr. Dunn's retirement?
> **Reuman:** I don't remember.
> **Dunn's Counsel:** Do you remember what you said regarding Mr.
> Dunn's retirement?
> **Reuman:** No, I don't.
> **Dunn's Counsel:** What was the overall gist of the discussion
> regarding Mr. Dunn's retirement?
> **Reuman:** I would say that the overall gist was that it was time
> for him to retire.

Doc. 52-7 at 3. Because "retire" is not synonymous with "age," the Board's general consensus

during the 2010 meeting that it was "time for [Dunn] to retire" is not, standing alone, direct

evidence of age discrimination. See Scott v. Potter, 182 F. App'x 521, 526 (6th Cir. 2006)

(explaining that "retire" is not synonymous with "age," and holding that without more,

employer's statement that plaintiff should "retire and make everybody happy" was not direct evidence of age discrimination); Erickson v. Farmland Indus., Inc., 271 F.3d 718, 725 (8th Cir. 2001) (employer's statement that "[t]wenty years is too long. You should have moved five years ago[,]" was not direct evidence of age discrimination absent showing that length of tenure was being used as a proxy to accomplish age discrimination). Rather, for the Board's 2010 discussion to constitute direct evidence of age discrimination, Dunn would need to show that the Board used the term "retire" as a proxy for age to articulate a discriminatory attitude. Scott, 182 F. App'x at 526; Erickson, 271 F.3d at 725. Dunn has made no such showing, but is asking for this Court to speculate and thereby to infer the existence of direct evidence based on the term "retire." The Board's discussion does not directly reflect a discriminatory attitude. Erickson, 271 F.3d at 725 (holding that employer's statement was not direct evidence where accepting statement as evidence of age animus depended on an inference).

Even if the Board had expressed a discriminatory attitude during the 2010 discussion, Dunn has failed to show a specific link between the Board's attitude and its decision to nonrenew his contract. After all, not only was there an almost two-year gap between the Board's 2010 discussion and the 2012 nonrenewal, but the Board rehired Dunn twice during this period despite him being at least sixty years old. Given these circumstances, any link between the 2010 discussion and the 2012 nonrenewal is too attenuated to constitute direct evidence. See Bone, 686 F.3d at 954 (holding that supervisors' reactions to comments did not constitute direct evidence of age discrimination where comments were made six months prior to plaintiff's discharge and were unconnected to the discharge decision); Haigh v. Gelita USA, Inc., 632 F.3d 464, 470 (8th Cir. 2011) ("We have noted it is unlikely a supervisor would hire an older

11

employee and then discriminate on the basis of age, and such evidence creates a presumption

against discrimination." (quoting Fitzgerald v. Action, Inc., 521 F.3d 867, 877 (8th Cir. 2008)));

Ramlet v. E.F. Johnson Co., 507 F.3d 1149, 1153 (8th Cir. 2007) (holding that comments made

at least four months before the adverse employment action were not connected to the decision-

making process and thus were not direct evidence of age discrimination).

   Dunn also argues that some of Eppard's statements constitute direct evidence of

discriminatory animus. The School District disagrees, contending that Eppard's statements are

not direct evidence because he is not a decisionmaker. See Elam v. Regions Fin. Corp., 601 F.3d

873, 878 (8th Cir. 2010) (explaining that statements by nondecisionmakers are not direct

evidence). Although Dunn does not dispute that the Board has the ultimate authority to make

staffing decisions, he argues that Eppard played such a significant role in the nonrenewal that his

statements can be considered direct evidence of discrimination.[4]  See King, 553 F.3d at 1161

---

[4]Dunn actually argues that the School District has "cat's-paw liability" for Eppard's statements but then cites a string of cases concerning employees who are closely involved in the decision making process. The cat's-paw theory describes "a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Diaz v. Tyson Fresh Meats, Inc., 643 F.3d 1149, 1151-52 (8th Cir. 2011) (quoting Qamhiyah v. Iowa State Univ. of Science & Tech., 566 F.3d 733, 742 (8th Cir. 2009); see also Staub v. Proctor Hosp., 131 S. Ct. 1186, 1194 (2011) (if a non-decisionmaker performs an act motivated by a discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action, then the employer has cat's-paw liability); Richardson v. Sugg, 448 F.3d 1046, 1060 (8th Cir. 2006) (explaining that the Eighth Circuit's cat's-paw rule "provides that 'an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design.'" (quoting Dedmon v. Staley, 315 F.3d 948, 949 n.2 (8th Cir. 2003))). The situation with Eppard is not so much a "cat's-paw liability" as a situation where Eppard, though not a direct decisionmaker, was so close to the process that his statements and actions may be considered as if being made by a decisionmaker. See Torgerson, 643 F.3d at 1044-45. Further, some courts have rejected or questioned application of the cat's-paw theory in ADEA cases after the Supreme Court's decision in Gross. See Sims v. MVM, Inc., 704 F.3d 1327, 1336 (11th Cir. 2013) ("Because the

12

(explaining that direct evidence may include comments by individuals closely involved with employment decisions); <u>Mohr v. Dustrol, Inc.</u>, 306 F.3d 636, 641 (8th Cir. 2002) (finding that comments by supervisor not "officially responsible" for hiring were direct evidence where supervisor played a "pivotal role" in hiring and officials deferred to his hiring decision) <u>abrogated on other grounds by</u> <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 95 (2003).   There is enough evidence to create a question of fact as to whether Eppard was closely involved with and played a pivotal role in the nonrenewal decision.  Eppard discussed with the Board whether it should continue employing Dunn, recommended that it nonrenew Dunn's contract, and ultimately informed Dunn that the District did not renew his employment. Doc. 50 at ¶¶ 43, 53; Doc. 41-12 at 13, 16.  Further, the Board generally relied on Eppard's statements about a teacher's performance, and Halverson and Reuman testified that they had never independently investigated a superintendent's report on such issues.  Doc. 50 at ¶¶ 43, 45; Doc. 52-11 at 2; Doc. 52-7 at 2. Finally, Eppard drafted on behalf of the School District a response to the EEOC setting forth the reasons he felt were pertinent to the nonrenewal.  Doc. 41-12 at 9; Doc. 41-23. Eppard's statements asserted by Dunn to be direct evidence of age discrimination occurred during the February 2012 meeting when Eppard asked Dunn whether he "was planning to retire that year or what [Dunn's] plans were" and told Dunn that the possible nonrenewal of his contract had "nothing to do with [his] job performance, that [he] had done everything [he] had always been

---

ADEA requires a 'but-for' link between the discriminatory animus and the adverse employment action as opposed to showing that the animus was a 'motivating factor' in the adverse employment decision, we hold that <u>Staub</u>'s 'proximate causation' standard does not apply to cat's paw cases involving age discrimination."); <u>Simmons v. Sykes Enters., Inc.</u>, 647 F.3d 943, 949-950 (10th Cir. 2011) (discussing application of <u>Staub</u> to the ADEA); <u>Wojtanek v. Dist. No. 8, Int'l Ass'n of Machinists & Aerospace Workers</u>, 435 F. App'x 545, 549 (7th Cir. 2011).

asked to do and done it well, but that [Eppard] had two good, young counseling interns living in the [D]istrict that [Eppard] did not want to lose to another district." Doc. 50 at ¶¶ 40, 42, 45; Doc. 41-4 at 3; Doc. 52-2 at 18-19.  Dunn also points to Eppard's statement in early March 2012 that he would be recommending nonrenewal of Dunn's contract because it was "time for a change at Lyman." Doc. 50 at ¶¶ 42, 74; Doc. 41-4 at 4; Doc. 52-18.

Whether considered individually or in conjunction, these statements are not direct evidence of age discrimination. When Eppard asked Dunn about his retirement plans, the School District had a legitimate interest in knowing how long Dunn planned to work.  At that time, Dunn had already retired once and was in the second half of his one-year contract. Dunn has not offered any evidence that Eppard's one-time inquiry was unreasonable or constitutes direct evidence of age discrimination. See Clark v. Matthews Intern. Corp., 628 F.3d 462, 470 (8th Cir. 2010) ("We have held that isolated inquires into the retirement plans of an employee that are reasonable and not unduly excessive are insufficient to establish age discrimination.") vacated in part on other grounds by Clark v. Matthews Intern. Corp., 639 F.3d 391 (8th Cir. 2011); Montgomery v. John Deere & Co., 169 F.3d 556, 560 (8th Cir. 1999) ("We have stated before that an employer may make reasonable inquiries into the retirement plans of its employees and that a plaintiff should not be able to rely on those inquiries to prove intentional discrimination."). Nor, as Dunn argues, do Eppard's statements that there were "two good, young" counseling interns living in the District and that it was "time for a change" show that Eppard was using the term "retire" as a proxy for age.  Eppard simply used the term "young" to describe Brittany and Diehm.  When, as here, employers use the word "young" to describe a person but not as a comparative or evaluative term, courts have declined to find direct evidence of discrimination.

14

See Buchholz v. Rockwell Int'l Corp., 120 F.3d 146, 149-50 (8th Cir. 1997); Merrick v. Farmers Ins. Grp., 892 F.2d 1434, 1438-39 (9th Cir. 1990). The Eighth Circuit in Buchholz held that a hiring supervisor's comment that the "young kids" he had hired instead of the plaintiff "sure were sharp" did not show a specific link between a discriminatory animus and the supervisor's decision not to hire the plaintiff. 120 F.3d at 149-50. Instead, the comment was a neutral remark about the capabilities of the new hires whom the "sixty-two-year-old supervisor simply described as young kids." Id. at 150 (citing Merrick, 892 F.2d at 1438-39). Similarly, the Ninth Circuit in Merrick held that an employer's comment that he chose a different applicant because the applicant was a "bright, intelligent, knowledgeable young man[,]" was a stray remark insufficient to defeat summary judgment. 892 F.2d at 1438-39.

Although Dunn points to three cases where employers used the term "young" and courts found direct evidence of discrimination, each of those cases involved statements by the employer about wanting or needing a younger employee, thereby demonstrating that age was a motivating factor in the employment decision. See Kneibert v. Thomson Newspapers, Mich., Inc., 129 F.3d 444, 452-53 (8th Cir. 1997) (decisionmaker's statement that he "had no use for a senior editor" and instead needed "three young editors" was direct evidence of age discrimination); Lindsey v. Am. Cast Iron Pipe Co., 772 F.2d 799, 801-02 (11th Cir. 1985) (employer's statement that he would be looking for a person "younger than [plaintiff]" to fill position was direct evidence of age discrimination in failure to promote case); Newsome v. KwangSung Am. Corp., 798 F. Supp. 2d 1291, 1297-98 (M.D. Ala. 2011) (decisionmaker's statement that he was going to replace employee with a "younger Korean" was direct evidence of discrimination). Here, it is undisputed that Eppard never called Dunn "old," never mentioned Dunn's age, and never told

15

him that the School District wanted someone younger to fill his position. Doc. 50 at ¶¶ 41, 42;
Doc. 41-4 at 3-4, 12, 17. Eppard's calling Brittany and Diehm young is more like the statements
in Buchholz and Merrick than the statements in Kneibert, Lindsey, and Newsome.

As for Eppard's telling Dunn that it was "time for a change," the Eighth Circuit in
Erickson held that similar statements were "legitimate business concerns" rather than direct
evidence of age discrimination. 271 F.3d at 725 (holding that employer's statements to plaintiff
that he was "stale," "set in his ways," and that the company "needed a new focus" were not direct
evidence). In sum, although the statements from Eppard and Reuman may be relevant to whether
the School District's reasons for nonrenewing Dunn were pretexts for age discrimination, they
do not constitute direct evidence of age discrimination.

### 2. McDonnell Douglas Standard

Under the burden-shifting framework set forth in McDonnell Douglas, Dunn has the
initial burden of establishing a prima facie case of age discrimination by showing he: "(1) was
at least forty years old, (2) suffered an adverse employment action, (3) was meeting his
employer's legitimate expectations at the time of the adverse employment action, and (4) was
replaced by someone substantially younger." Gibson v. Am. Greetings Corp., 670 F.3d 844, 856
(8th Cir. 2012) (quoting Morgan v. A.G. Edwards & Sons, Inc., 486 F.3d 1034, 1039 (8th Cir.
2007)). If Dunn establishes a prima facie case, then the burden of production shifts to the School
District to proffer legitimate, nondiscriminatory reasons for its actions. Onyiah v. St. Cloud State
Univ., 684 F.3d 711, 719 (8th Cir. 2012). If the School District meets this burden, Dunn must
show that the proffered reasons were a pretext for age discrimination. Id. Dunn at all times
retains the "ultimate burden of persuasion that 'age was the "but-for" cause'" of the School

District's adverse action. Id. (quoting Rahlf v. Mo-Tech Corp., 642 F.3d 633, 637 (8th Cir.
2011)). The School District agrees for the purpose of considering its summary judgment motion
that Dunn is at least forty years old and that he was meeting its legitimate expectations, but
disputes that Dunn suffered an adverse employment action or was replaced by someone
substantially younger.

### a. Adverse Employment Action

The parties' main dispute under this element concerns whether the Board's nonrenewal
of Dunn's contract constitutes an adverse employment action. The School District argues that
the nonrenewal was not an adverse employment action because once Dunn retired he became a
nontenured employee with no expectation of a continuing contract and could therefore be
nonrenewed without cause. See S.D. Codified Laws (SDCL) § 13-43-6.3 (stating that a school
is not required to give a reason for nonrenewal to a nontenured teacher); Wirt v. Parker Sch. Dist.
No. 60-4, 689 N.W.2d 901, 905-07 (S.D. 2004) (holding that teacher who voluntarily resigned,
cashed out her sick leave, and was then rehired on a one-year contract no longer had tenure). The
School District argues further that because it had only hired Dunn for one year, he could not have
suffered an adverse employment action when it did not renew his contract. Dunn disagrees,
arguing that this Court and several others have rejected the same arguments the School District
offers here.

"An adverse employment action is a tangible change in working conditions that produces
a material employment disadvantage." Thomas Corwin, 483 F.3d 516, 528-29 (8th Cir. 2007)
(quoting Wedow v. City of Kan. City, Mo., 442 F.3d 661, 671 (8th Cir. 2006)). Although it
appears that the Eighth Circuit has yet to address whether the nonrenewal of a plaintiff's contract

17

can constitute an adverse employment action, this Court in Sloat v. Rapid City Area School District No. 51-4, 393 F. Supp. 2d 922 (D.S.D. 2005), held that the nonrenewal of a teacher's one-year contract was an adverse employment action under the ADEA. Id. at 930. Like Sloat, several circuits and multiple district courts have held that the nonrenewal of an employment contract may constitute an adverse employment action. Giles v. Daytona State Coll., Inc., 542 F. App'x 869, 873 (11th Cir. 2013) (per curiam) (deeming the "2010 nonrenewal of [the plaintiff's] annual contract [to be] an adverse employment action"); Bleeker v. Vilsack, 468 F. App'x 731, 732 (9th Cir. 2012) ("Even inaction—a failure to renew or extend an employment contract—can count as an adverse employment action in some circumstances."); Leibowitz v. Cornell Univ., 584 F.3d 487, 501 (2nd Cir. 2009) ("An employee seeking a renewal of an employment contract, just like a new applicant or a rehire after a layoff, suffers an adverse employment action when an employment opportunity is denied and is protected from discrimination in connection with such decisions under Title VII and the ADEA.") superseded by statute on other grounds as recognized by Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 108-09 (2nd Cir. 2013); Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 320 (3rd Cir. 2008) ("The failure to renew an employment arrangement, whether at-will or for a limited period of time, is an employment action, and an employer violates Title VII if it takes an adverse employment action for a reason prohibited by Title VII . . . ."); Jadwin v. Cnty. of Kern, 610 F. Supp. 2d 1129, 1171 (E.D. Cal. 2009) ("The non-renewal of Plaintiff's contract can qualify as an adverse employment action."); Hernandez-Mejias v. Gen. Elec., 428 F. Supp. 2d 4, 8 (D.P.R. 2005) (holding that failure to renew contract was adverse employment action); Kabes v. Sch. Dist. of River Falls, 387 F. Supp. 2d 955, 975 (W.D. Wis. 2005)

("Defendant's nonrenewal of [plaintiff's] contract constitutes an adverse employment action.");

but see Ewald v. Royal Norwegian Embassy, No. 11-CV-2116 (SRN/SER), 2014 WL 896726,

at *14 (D. Minn. Mar. 6, 2014) (holding that nonrenewal of three-year contract that did not

contain any provision for renewal was not a material employment disadvantage).  In addition,

at least one circuit has rejected the School District's argument that the discretionary nonrenewal

of an employment contract cannot constitute an adverse employment action.  See Leibowitz, 584

F.3d at 501 ("The mere fact that the employer's decision not to renew is completely discretionary

does not mean that it is not an 'adverse' employment decision.").

The School District fails to address Sloat, and argues only that the other cases Dunn relies

on are not from the Eighth Circuit.  However, this Court finds persuasive the reasoning in

Liebowitz and other cases that, because both the failure to hire a prospective employee and the

termination of an at-will employee can constitute an adverse employment action under the

ADEA, so can the nonrenewal of a contract like Dunn's.  See Liebowitz, 584 F.3d at 500 ("Were

we to accept defendants' argument [that the nonrenewal of a contract cannot constitute an adverse

employment action], we would effectively rule that *current* employees seeking a renewal of an

employment contract are not entitled to the same statutory protections under the discrimination

laws as *prospective* employees."); Hernandez-Mejias, 428 F. Supp. 2d at 8 ("As even at-will

employees and job applicants are entitled to Title VII protection, we agree with the

overwhelming majority of courts that non-renewal of an employment contract constitutes an

adverse employment action.") (internal citations omitted); Walker v. Bd. of Regents of Univ. of

Wis. Sys., 300 F. Supp. 2d 836, 851-52 (W.D. Wis. 2004) (explaining that plaintiff with a term

contract who could be dismissed at any time was little different from an at-will employee and

holding that the nonrenewal of the plaintiff's contract was an adverse employment action under Title VII). Construing the evidence in Dunn's favor, the School District was aware that Dunn was seeking renewal of his contract when he told Eppard in February 2012 that he planned on continuing to work for the School District rather than retiring. Doc. 50 at ¶ 40; Doc. 41-4 at 3; Doc. 52-2 at 18. As such, the School District's nonrenewal of Dunn's contract was an adverse employment action under the ADEA.[5]

### b. Replaced by Someone Substantially Younger

At the time the Board nonrenewed Dunn's contract and hired Brittany, Dunn was sixty-two and Brittany was twenty-four or twenty-five. Doc. 50 at ¶ 95. The School District does not seriously dispute that Brittany was Dunn's replacement. Instead, the School District cites several cases from the Eighth Circuit and argues that a younger teacher becoming the guidance counselor after Dunn's nonrenewal does not create a reasonable inference of age discrimination. See Doc. 42 at 13-14 (citing Otto v. City of Victoria, 685 F.3d 755 (8th Cir. 2012); Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507 (8th Cir. 2011); Carraher v. Target Corp., 503 F.3d 714 (8th Cir. 2007)). These cases had all progressed beyond the fourth prong of a plaintiff's prima facie test for age discrimination, however, and they therefore add little to the School District's argument. See Otto, 685 F.3d at 759-60 (proceeding "directly to the ultimate question of discrimination" and finding the fact that younger workers assumed the duties of the plaintiff after he was terminated could not, standing alone, support a reasonable inference of age

---

[5]Dunn also argues that such things as the NHS advisor position becoming unfunded and the proposed reduction in force that never occurred constitute adverse employment actions. The nonrenewal of Dunn's contract is an adverse employment action, but the other matters asserted by Dunn are not.

discrimination); Tusing, 639 F.3d at 515-17 (assuming the plaintiff had established a prima facie case of age discrimination and holding that the defendant's decision to hire employees that were younger than the plaintiff did not create an inference of discrimination); Carraher, 503 F.3d at 717-719 (concluding that the plaintiff had established a prima facie case of age discrimination but holding that defendant's decision to replace the plaintiff with someone twenty-eight years younger was insufficient to persuade jury that the plaintiff was discriminated against). The approximately thirty-seven year age difference between Dunn and Brittany is significant enough to satisfy the fourth element of Dunn's prima facie case. See Riley v. Lance, Inc., 518 F.3d 996, 1000 (8th Cir. 2008) ("As to part four of the prima facie case, Lance does not dispute Riley's contention that he was replaced with a substantially younger person. That fact alone gives rise to the necessary inference of age discrimination."); Keathley v. Ameritech Corp., 187 F.3d 915, 920-21 (8th Cir. 1999) (holding that fourteen-year age difference is sufficient to infer discrimination) abrogated on other grounds by Torgerson, 643 F.3d 1031.

### c. The School District's Reasons for Nonrenewing Dunn's Contract

Because Dunn has established a prima facie case of age discrimination, the burden shifts to the School District to articulate a legitimate, nondiscriminatory reason for nonrenewing Dunn's contract. Onyiah, 684 F.3d at 719. The burden to articulate a nondiscriminatory reason is not onerous. Buchholz, 120 F.3d at 150; see also Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 958 (8th Cir. 1995) ("This is a burden of production not proof. The defendant need not persuade the court, it must simply provide evidence sufficient to sustain a judgment in its favor.").

As evidence that it had a legitimate reason for the nonrenewal, the School District points to the Board's concerns about Dunn's performance, including: 1) Halverson's testimony that,

based on statements from her daughter and other parents about Dunn being unhelpful with scholarships, Halverson believed the Board needed to find someone more helpful to students, Doc. 41-10 at 4-5; 2) Reuman's testimony that she drew on her own experiences with Dunn when deciding whether to renew his contract, including Dunn calling one of her children by the wrong name when presenting him with a scholarship at an awards banquet and Dunn not knowing that her other child played football, Doc. 52-7 at 4-5; and 3) testimony from Uthe and Eppard that, when discussing whether to renew Dunn's contract, the Board had expressed a belief that Dunn was not a very good counselor, Doc. 41-11 at 2, Doc. 41-12 at 14.

The parties dispute whether this Court should consider Eppard's response to the EEOC as part of the School District's rationale for nonrenewing Dunn's contract. Dunn focuses heavily on undermining the statements in Eppard's response while the School District argues that the response is irrelevant because Eppard was not a decisionmaker and only created the document at the EEOC's request.

As noted earlier, although Eppard was not the ultimate decisionmaker, there is sufficient evidence to create a question of fact concerning whether Eppard was closely and significantly involved in the nonrenewal decision. This same evidence—including Eppard's discussion with the Board about Dunn's employment, Eppard's nonrenewal recommendation, the Board's general reliance on Eppard's recommendations and statements about a teacher's performance, and Eppard's drafting a response to the EEOC on the School District's behalf—demonstrates enough of a link between the matters Eppard chose to include in the response to the EEOC and the Board's decision to nonrenew Dunn's contract for consideration of the response to the EEOC in determining whether to grant summary judgment. See Loeb v. Best Buy Co., 537 F.3d 867, 873

(8th Cir. 2008) (rejecting plaintiff's argument that statements from nondecisionmakers should be considered as reasons for plaintiff's termination because plaintiff had failed to "establish some causal relationship to show the significance of . . . statements made by persons other than the relevant decision-maker to the resolution of the ultimate issue of intentional discrimination" (quoting Carraher, 503 F.3d at 718)); see also Carraher, 503 F.3d at 718 (explaining that one of the factors considered when determining the existence of a causal relationship is whether the statements in question "were made by employees who took part in the decision or influenced the decision to terminate the plaintiff" (quoting Wittenburg v. Am. Express Fin. Advisors, Inc., 464 F.3d 831, 837 (8th Cir. 2006))). As such, the matters contained in Eppard's EEOC response have at least some relevance to the School District's rationale for nonrenewing Dunn's contract.

　　Without waiving its argument that Eppard's response is irrelevant, the School District asserts that the response provides legitimate, nondiscriminatory reasons for Eppard's recommendation that Dunn not be renewed. Eppard wrote in the response that he had concerns about Dunn's job performance, his personality, and his lack of connection to students, staff, and parents in the School District. Doc. 41-23. Eppard wrote that Dunn was unhelpful to staff at times, that students were hesitant to approach Dunn for guidance on scholarships and personal problems, that Dunn had a minimal connection to younger students, that Dunn was unaware of students' backgrounds because of the minimal counseling he provided, that Dunn rarely attended the School District's events, and that Diehm and Brittany did things with scholarships that Dunn had never considered. Doc. 41-23. Eppard explained some of these issues more fully in his deposition. Doc. 41-23; Doc. 41-12 at 10-11, 20-22.

Regardless of whether Eppard's response to the EEOC is considered, the School District's justifications for nonrenewing Dunn's contract are sufficient to meet its burden at this stage. Buchholz, 120 F.3d at 150; Krenik, 47 F.3d at 958. In any event, Dunn does not appear to dispute that the School District has satisfied its burden and instead proceeds directly to arguing that the School District's proffered justifications are pretext for discrimination. Doc. 51 at 21-22.

### d. Pretext

Because the School District has provided legitimate, nondiscriminatory reasons for not renewing Dunn's contract, the burden shifts back to Dunn to establish pretext. Although there are multiple ways to demonstrate pretext, plaintiffs typically do so by offering evidence that the employer's rationale is "unworthy of credence . . . because it has no basis in fact" or that "a [prohibited] reason more likely motivated the employer." Torgerson, 643 F.3d at 1047 (quoting Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006)). To survive summary judgment at this stage, Dunn must "present evidence, that considered in its entirety (1) creates a fact issue as to whether [the School District's] proffered reasons are pretextual and (2) creates a reasonable inference that age was a determinative factor in the adverse employment decision." Tusing, 639 F.3d at 516 (quoting Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1079 (8th Cir. 2008)).

There are genuine issues of fact concerning whether the School District's proffered justifications for nonrenewing Dunn are pretext. Although the School District pointed to problems with Dunn's personality, performance, and connection with students and staff, Dunn has offered evidence that casts doubt on these justifications. Muirhead, the School District's other counselor and Dunn's coworker since 1995, stated in an affidavit that she had never

24

observed that students were hesitant to approach Dunn for guidance on scholarships or other problems and that Dunn was very connected and involved with students and worked diligently to learn their backgrounds. Doc. 50 at ¶ 45; Doc. 52-24. Dunn also submitted affidavits from Thomas Authier, Amanda Longhenry, and Keith Herman, all teachers with the School District, stating that they disagreed with some of the School District's justifications for nonrenewing Dunn and providing examples of Dunn's good job performance. Doc. 50 at ¶ 45; Doc. 52-21; Doc. 52-22; Doc. 52-23. These examples included Authier's statements that Dunn helped his children a great deal with financial aid and scholarships and that Dunn often visited Authier's classroom to provide information about scholarships and upcoming college application deadlines, Doc. 52-21, as well as Longhenry's observation that the children in her classroom enjoyed having Dunn visit and that Dunn made a point of attending one event of each activity per season. Doc. 52-22.

The School District contends that the affidavits from nondecisionmakers like Dunn's coworkers have little value, but there is evidence from a former supervisor concerning Dunn's performance. Former superintendent Carrier testified during his deposition that Dunn "always" got information about scholarships out and that he met regularly with seniors. Doc. 50 at ¶ 46; Doc. 52-3 at 4. Carrier had received complaints from parents about Dunn's work on scholarships, yet he characterized these as "[n]othing serious," and stated that the complaints were "not even close" to requiring discipline. Doc. 50 at ¶ 46; Doc. 52-3 at 2-3. While Carrier was superintendent, he consistently gave Dunn positive employment evaluations, with the last one coming in 2009. Doc. 52 at ¶ 45; Doc. 52-20.[6]

---

[6]The employment evaluation forms run from 1996 through 2002 and one from 2009. The record is unclear why there is a gap between 2002 to 2009 or a lack of evaluations after 2009.

Although the School District is correct that Carrier's testimony and the past performance evaluations are insufficient by themselves to prevent summary judgment, it is mistaken in arguing that this evidence is totally irrelevant. See Guimaraes v. SuperValu, Inc., 674 F.3d 962, 975 (8th Cir. 2012) ("'[E]vidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and discrimination,' but it 'can be relevant when considering whether the record as a whole establishes a genuine issue of material fact.'" (quoting Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1020 (8th Cir. 2005))).   Of course, positive performance evaluations may not be dispositive of the existence of pretext. See Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1137-38 (8th Cir. 2006) ("While favorable performance reviews sometimes provide evidence of pretext, . . . we agree with the district court that receipt of positive reviews in the past, in and of itself, does not necessarily raise an inference of age discrimination.") (internal quotation marks and citations omitted); Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1109 (8th Cir. 1998) (explaining that while employee's performance evaluations may demonstrate that employee performed well in the past, they did "not render her more recent negative evaluations inherently untrustworthy").   However, here, none of Eppard's concerns about Dunn's performance or lack of a connection to staff and students were reflected in Carrier's evaluations of Dunn.  Doc. 52-20.  In fact, Carrier's evaluation of Dunn in 2009 conflicts with some of Eppard's concerns, with Carrier giving Dunn a "satisfactory," the highest possible rating, with respect to Dunn's cooperation and interaction with staff, his dissemination of information for post high school educational and career opportunities, his support and participation in school activities with staff and parents, and his maintaining a visible profile in

the school and the community.[7] Doc. 52-50 at 20.  Viewed in the light most favorable to Dunn, Dunn's strong employment appraisal history, the dearth of documentation concerning Dunn's performance problems under Eppard and Garnos, and the failure by Eppard and Garnos to inform Dunn of the same are evidence of possible pretext.[8]  See, e.g., Lloyd v. Ga. Gulf Corp., 961 F.2d 1190, 1195 (5th Cir. 1992) ("We have very recently held that, when an employer's stated motivation for an adverse employment decision involves the employee's performance, but there is no supporting documentation, a jury can reasonably infer pretext."); Stanfield v. Answering Serv., Inc., 867 F.2d 1290, 1294 (11th Cir. 1989) (finding that lack of disciplinary reports in employee's file and lack of verbal complaints about her work habits supported a reasonable jury's conclusion that company's articulated reason for terminating employee was a pretext for age discrimination).  Although Eppard testified that he had several discussions with Garnos and Julie about Dunn's performance, Eppard neither documented these discussions nor communicated to Dunn any concerns he or others had about Dunn's performance.  Doc. 50 at ¶ 37; Doc. 41-4 at 18; Doc. 41-12 at 4, 15, 17.  The only verbal or written complaint Dunn received from Garnos about his performance was the staff evaluation form that Garnos did not provide to Dunn until well after the Board had decided to nonrenew Dunn's contract.  Doc. 50 at ¶¶ 38, 80; Doc. 41-4 at 18; Doc. 52-5 at 4-5; Doc 52-25.

---

[7]In fairness, Carrier testified that although Dunn had attended a significant amount of school events towards the beginning of his time with the School District, Dunn did not attend very many events in Carrier's last three or four years with the School District.  Doc. 52-3 at 7.  Carrier explained, however, that Dunn was not falling short in his job duties by attending fewer events.  Doc. 52-3 at 7.

[8]The absence of poor performance evaluations of course does not itself suffice to prove pretext.  See Hague v. Thompson Distrib. Co., 436 F.3d 816, 826-27 (7th Cir. 2006).

27

Finally, the arguably shifting explanations for nonrenewing Dunn's contract support a finding of pretext. See Loeb, 537 F.3d at 873 ("Pretext may be shown with evidence that the employer's reason for the termination has changed substantially over time."). When Eppard met with Dunn in February 2012, according to Dunn, he told Dunn that the possible nonrenewal of his contract had "nothing to do with [Dunn's] job performance," and that Dunn "had done everything [he] had always been asked to do and done it well[.]" Doc. 41-4 at 3; Doc. 51 at ¶¶ 42, 45. Conversely, Eppard's response to the EEOC identified several problems with Dunn's job performance as reasons Eppard felt were pertinent to Dunn's nonrenewal. Doc. 41-23. Contrary to the School District's argument, this is not a situation, viewed in the light most favorable to Dunn, where Eppard gave Dunn a reason for his possible nonrenewal in February 2012 and then merely elaborated on this reason in his response to the EEOC. See Elam, 601 F.3d at 881 ("While '[s]ubstantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext, this does not mean that an employer cannot elaborate on its proffered reason.'" (quoting Rodgers v. U.S. Bank, N.Am., 417 F.3d 845, 855 (8th Cir. 2005))). Rather, Eppard's response to the EEOC, viewed in the light most favorable to Dunn, is a shift away from his alleged statement that Dunn's nonrenewal was unrelated to his job performance, and the discrepancy between these two statements is substantial enough to indicate pretext and thereby avoid summary judgment. See Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1023 (8th Cir. 1998) (holding that plaintiff raised genuine fact issue concerning pretext by presenting evidence that his employer initially told him that he was terminated because of poor performance but later claimed the termination was due to a lack of work). Taken together, the affidavits from Dunn's coworkers, Carrier's testimony, Dunn's employment history, and

Eppard's arguably shifting rationale for the nonrenewal create a fact issue as to whether the School District's proffered reasons for nonrenewing Dunn were pretextual.

As the School District notes, however, a showing of pretext is not by itself sufficient to avoid summary judgment. Gibson, 670 F.3d at 856. Dunn also must show that the facts permit a reasonable inference that his age was a determinative factor in the School District's decision to nonrenew his contract. Id. Of course, this does not necessarily mean that Dunn must introduce additional evidence of discriminatory animus beyond his prima facie case and evidence of pretext. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000). In certain circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148.

Here, Dunn likens his case to Fisher v. Pharmacia & Upjohn, 225 F.3d 915 (8th Cir. 2000), and argues that Eppard's statement, as Dunn recalls it, that he had "two good, young counseling interns" that he "did not want to lose," when considered in conjunction with Dunn's prima facie case and evidence of pretext, creates enough of an inference of intentional discrimination to avoid summary judgment. The plaintiff in Fisher not only cast significant doubt on each of his employer's proffered reasons for demoting him, but also offered evidence that management-level employees made derogatory age-related comments, including a statement by the vice-president that "[w]e need to get rid of the old guys," a remark by a director that the employer "wanted to bring some of the younger people along faster[,]" and the plaintiff's supervisor calling him "the old guy." Id. at 922. The Eighth Circuit held that even assuming that these comments were stray remarks not causally related to the adverse employment action, they

29

were the type of remarks that "could cause a reasonable trier of fact to raise an eyebrow" and, when taken in conjunction with the plaintiff's prima facie case and evidence of pretext, gave rise to an inference of intentional discrimination. Id. at 922-23 (citation and internal quotation marks omitted).

Eppard's comment is not nearly as indicative of an ageist attitude in the workplace as were the comments in Fisher. Unlike the comments in Fisher, however, Eppard's comment was related to the decision-making process as Eppard made the comment when explaining that Dunn might not be renewed. Given Eppard's arguably shifting explanation for Dunn's nonrenewal and the other evidence Dunn has offered to show pretext, a reasonable fact finder could infer that Eppard's asking Dunn about his retirement and, according to Dunn, then stating that he had "two good, young counseling interns" that he "did not want to lose" meant that Eppard was going to recommend nonrenewal of Dunn's contract because he wanted to hire someone younger than Dunn.

Dunn does not have a strong case that the School District engaged in intentional age discrimination. Viewed in the light most favorable to Dunn, however, Dunn's prima facie case, his evidence of pretext, and Eppard's statement during the February 2012 meeting are enough to create a fact issue for the jury. Accordingly, the School District's motion for summary judgment on Count I of Dunn's Amended Complaint is denied.

## B. State Law Claims[9]

### 1. Breach of Fiduciary Duty and Breach of Loyalty

---

[9]This Court has subject matter jurisdiction over Dunn's state law claims because they are so closely related to Dunn's ADEA claim that they form part of the same case or controversy under Article III of the United States Constitution.  28 U.S.C. § 1367(a).

Count II of Dunn's Amended Complaint alleges that the Board's hiring of Brittany and Reuman's participation in the decision to nonrenew his contract constituted a breach of fiduciary duty and a breach of loyalty. Dunn contends in his Amended Complaint that these actions violated standard ten of the Code of Ethics of the Associated School Boards of South Dakota (ASBSD) and SDCL section 47-1A-830. Doc. 22 at 10. Standard ten of the ASBSD's ethical standards states "I will refuse to use my position as a board member for personal gain or the gain of special interests or partisan politics[,]" Doc. 41-28, while section 47-1A-830 states in relevant part that members of the board of directors of a corporation shall act in good faith while discharging their duties. The School District in its brief in support of its motion for summary judgment offers multiple reasons why Count II of Dunn's Amended Complaint fails, including: 1) that Dunn lacks standing to assert a cause of action for a breach of fiduciary duty or a breach of loyalty in this context; 2) that Dunn's employment contract did not make the School District Dunn's fiduciary; 3) that even assuming a fiduciary relationship, there was no breach; 4) that SDCL section 47-1A-830, which is a portion of the South Dakota Business Corporation Act, does not provide a private cause of action to a plaintiff in Dunn's position and is inapplicable to a public entity like the Board; 5) that SDCL section 6-1-17 prohibits Dunn from asserting his claims in Count II; and 6) that the ASBSD's ethical standards are non-binding suggestions from a private nonprofit organization and are insufficient to create a remedy beyond that authorized in section 6-1-17.

Dunn fails to respond to any of the School District's arguments in his brief in opposition to summary judgment, thereby waiving any argument concerning the ASBSD's ethical standards and SDCL section 47-1A-830. See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs., 558 F.3d

731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver

of that argument."). Instead, Dunn recasts his claim as one based on the Code of Ethics for

Professional Administrators (Code of Ethics), which provides in relevant part that

> [t]he professional administrator shall comply with the
> following code of ethics:
> (1) Make the well-being of the students the basis of
> decision making and action;
> . . . .
> (10) Not allow professional decisions or actions to be
> impaired or influenced by personal gain, gifts, gratuities,
> favors, and services made or withheld;
> (11) Avoid preferential treatment and conflicts of interest;
> . . . .
> (14) Accurately represent personal qualifications and the
> evaluations and recommendations of others . . . .

S.D. Admin. R. (ARSD) 24:11:03:01.  Dunn made no mention of the Code of Ethics in Count

II of his Amended Complaint.  Dunn's arguments under the Code of Ethics are insufficient to

avoid summary judgment on Count II of his Amended Complaint.

Preliminarily, Dunn does not have a claim for breach of fiduciary duty or breach of a duty

of loyalty against the School District.  To establish a claim for breach of a fiduciary duty, Dunn

must show that the School District was acting as his fiduciary.  See Chem-Age Indus., Inc. v.

Glover, 652 N.W.2d 756, 772 (S.D. 2002) (explaining that plaintiff asserting a claim for breach

of a fiduciary duty must show a fiduciary relationship).  The Supreme Court of South Dakota has

declined to find a fiduciary relationship absent evidence that a party placed his trust and

confidence in the alleged fiduciary and that the party was in a position of dependence, inequality,

lack of knowledge, or a similar state allowing the alleged fiduciary an advantage.  Bienash v.

Moller, 721 N.W.2d 431, 434 (S.D. 2006).  Dunn has not offered any evidence that he satisfies

this standard. The only possible justification for finding a fiduciary relationship is Dunn's status

as the School District's employee. South Dakota follows "the traditional view that fiduciary

duties are not inherent in normal arm's-length business relationships, and arise only when one

undertakes to act primarily for another's benefit." Poulos v. Summit Hotel Props., LLC, No. CIV

09-4062-RAL, 2010 WL 3604127, at *13 (D.S.D. Sept. 10, 2010) (quoting Nelson v. WEB

Water Dev. Ass'n, Inc., 507 N.W.2d 691, 698 (S.D. 1993)). Dunn's employment with the School

District was a typical arm's-length business relationship and was insufficient to transform the

School District into his fiduciary.

With respect to Dunn's claim for breach of a duty of loyalty, the Supreme Court of South

Dakota has recognized the existence of a duty of loyalty in certain circumstances.  See In re

Estate of Moncur, 812 N.W.2d 485, 488 (S.D. 2012) (noting that a trustee owes a duty of loyalty

to beneficiaries of a trust); Behrens v. Wedmore, 698 N.W.2d 555, 576 (S.D. 2005) (recognizing

that attorneys owe their clients a duty of loyalty); Setliff v. Stewart, 694 N.W.2d 859, 867 (S.D.

2005) (stating that employees may owe their employers a duty of loyalty); Dinsmore v. Piper

Jaffray, Inc., 593 N.W.2d 41, 46 (S.D. 1999) (finding that securities brokers owe their clients a

duty of loyalty); Hurney v. Locke, 308 N.W.2d 764, 768-69 (S.D. 1981) (holding that real estate

agents owe their clients a duty of loyalty). None of these circumstances exist here, however, and

Dunn has not directed this Court to any South Dakota case holding that a school district owes

its teachers a duty of loyalty.

Perhaps in recognition that he has no claims for breach of a fiduciary duty or a duty of

loyalty, Dunn asserts that under the Code of Ethics, the School District owes a duty to "the

school, district[,] and students" to "employ and retain the most qualified teachers in every

33

position." Doc. 51 at 33. This argument has at least two major flaws.

First, although Dunn claims that the School District breached this alleged duty, he makes no attempt to explain why the School District owes any duty to him in particular to "employ and retain the most qualified teachers in every position." See Doc. 51 at 33. Moreover, if the Code of Ethics were held not only to establish that school districts owe a duty to hire the most qualified teachers but also to allow teachers and students to enforce this duty via a private cause of action, then state circuit courts and federal district courts exercising supplemental jurisdiction would have jurisdiction to review a school district's hiring decision any time there was a disagreement about whether the teacher hired was "the most qualified." There is no indication in the Code of Ethics or anywhere else that the South Dakota Legislature intended such a result.

Second, Dunn's argument that the Board's actions violated the Code of Ethics provisions concerning conflicts of interest is misplaced. Because school board officials are not "Administrators" as that term is defined in ARSD 24:11:01:01, the Code of Ethics for Professional Administrators is inapplicable to the Board and its members. ARSD 24:11:01:01(7) and (8) define a "Chief administrator" as "an administrator, including a superintendent or chief executive officer (CEO), solely accountable to the appropriate educational governing board, whose responsibilities encompass the total educational operation of a school or district" and an "Administrator" as "any educational administrator other than the chief administrator or business manager[.]" That is, an "Administrator" and "Chief administrator" is someone ultimately supervised by a school board and not the school board itself. Indeed, the South Dakota Legislature in creating the entity that promulgated the Code of Ethics makes the same distinction. SDCL § 13-43-38 (creating the Professional Administrators Practices and Standards

34

Commission, the organization that promulgated the Code of Ethics, and differentiating between administrators and school board members when setting forth the constituency of the Commission).   Section 13-43-38 states in relevant part:

> There is hereby created the South Dakota Professional Administrators Practices and Standards Commission, which shall consist of seven members, as follows: (1) Five representative members who are employed as full-time administrators: two who are principals, two who are chief administrators of school districts offering an accredited twelve-year program of education, and one who is employed in an administrative capacity other than previously listed; (2) One representative who is a school board member . . . .

That is, a "school board member" is considered in SDCL section 13-43-48 to be separate from "administrators" or "chief administrators[,]" and "one who is employed in an administrative capacity[.]"

Beyond that, Dunn's reliance on the Code of Ethics overlooks the fact that South Dakota has a statute that prohibits county, municipal, and school officials from partaking in matters in which they have a conflict of interest.   See SDCL § 6-1-17 ("No county, municipal, or school official may participate in discussing or vote on any issue in which the official has a conflict of interest.").   "School officials" who discuss and vote on official matters as used in section 6-1-17 logically includes school board members.   If officials violate section 6-1-17 by voting on or discussing an issue in which they have a direct pecuniary interest, an injured party's sole legal remedy is to have the officials' votes invalidated.   Id.   Dunn has not pointed to any case law, statutes, or administrative regulations suggesting that the Code of Ethics—an administrative regulation that does not even apply to the Board—allows him to circumvent the remedial

limitation in section 6-1-17.

Although Dunn did not make the allegation in Count II of his Amended Complaint, he argues in his brief that Eppard violated the Code of Ethics by not accurately representing Dunn's qualifications to the Board or the EEOC. Doc. 51 at 34. Unlike the Board, Eppard would be subject to the Code of Ethics. However, if Eppard's conduct did violate the Code of Ethics, South Dakota's administrative regulations provided Dunn with a remedy; a person asserting a violation of the Code of Ethics may file a complaint with the Professional Administrative Practices and Standards Commission. ARSD 24:11:04:01. The Commission may then investigate the matter and is authorized to reprimand the administrator or recommend a disciplinary action. SDCL §§ 13-43-48, 13-43-49; ARSD 24:11:04:02. The South Dakota Legislature has not provided a private cause of action for the violation of the Code of Ethics. The Code of Ethics and the accompanying regulations allowing a party to file a complaint with the Commission are similar to the rules of professional conduct for attorneys. With respect to certain rules of professional conduct for attorneys, the Supreme Court of South Dakota has stated: "[v]iolation of a Rule [of Professional Conduct] should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability." Behrens, 698 N.W.2d at 575-76 (citation omitted). The same reasoning applies to the Code of Ethics. The School District's motion for summary judgment on Count II of the Amended Complaint is granted.

**2. Intentional Infliction of Emotional Distress**

Dunn alleges intentional infliction of emotion distress in Count III of his Amended

Complaint.  Plaintiffs alleging intentional infliction of emotional distress in South Dakota must

show four elements:

> 1. An act by defendant amounting to extreme and outrageous conduct;
> 2. Intent (or recklessness) on the part of the defendant to cause plaintiff severe emotional distress;
> 3. The defendant's conduct was the cause-in-fact of plaintiff's distress; and
> 4. The plaintiff suffered an extreme disabling emotional response to defendant's conduct.

Reeves v. Reiman, 523 N.W.2d 78, 83 (S.D. 1994) (quoting Tibke v. McDougall, 479 N.W.2d

898, 906 (S.D. 1992)).  Plaintiffs attempting to demonstrate that a defendant's conduct was

extreme and outrageous face a high threshold.  See Harris v. Jefferson Partners, L.P., 653

N.W.2d 496, 500 (S.D. 2002) ("Proof under this tort must exceed a rigorous benchmark.").  To

be actionable, the defendant's conduct "must be so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly

intolerable in a civilized community." Fix v. First State Bank of Roscoe, 807 N.W.2d 612, 618

(quoting Harris, 653 N.W.2d at 500).  The conduct must be of a nature that is "calculated to

cause," and which actually causes, extremely serious mental distress.  Citibank (S.D.), N.A. v.

Hauff, 668 N.W.2d 528, 535 (S.D. 2003) (quoting Richardson v. E. River. Elec. Coop., Inc., 531

N.W.2d 23, 27 (S.D. 1995)).  Whether a defendant's conduct is extreme and outrageous enough

to permit recovery is initially a question for the trial court.  Fix, 807 N.W.2d at 618; Richardson,

531 N.W.2d at 27-28.  Only "[w]here reasonable men may differ, [is it] for the jury . . . to

determine whether, in the particular case, the conduct has been sufficiently extreme and

outrageous to result in liability." Richardson, 531 N.W.2d at 27 (quoting Restatement (Second)

37

of Torts § 46 cmt. h (1965)).

As evidence that the School District engaged in extreme and outrageous conduct, Dunn points to Eppard asking him about his retirement plans and allegedly saying that there were two "good, young counseling interns" living in the School District that he didn't want to lose, the nonrenewal of his contract, the misplacement of his employment file, the Board's decision to hire a younger employee who was related to a Board member, and Eppard's response to the EEOC. Even taking this evidence in the light most favorable to Dunn, it does not constitute such "extreme and outrageous conduct" to give rise to a viable claim of intentional infliction of emotional distress under South Dakota law.

To begin with, asking Dunn about his retirement plans and deciding whom to hire as his replacement were reasonable actions that an employer such as the School District was entitled to take. Although Dunn raises concerns about nepotism, Reuman did not participate in the Board's decision to hire Brittany and the evidence of nepotism Dunn has presented, while perhaps calling the Board's objectivity into question, is not enough to nudge the Board's conduct past the "rigorous benchmark" set by the Supreme Court of South Dakota for a viable claim of intentional infliction of emotional distress.

Next, with respect to the nonrenewal of his contract, Dunn has not offered any evidence that Eppard or anyone else from the School District exceeded "all possible bounds of decency" when communicating with him about his nonrenewal or that the School District knew or should have known that he was particularly susceptible to emotional distress. See Harris, 653 N.W.2d at 500; Moysis v. DTG Datanet, 278 F.3d 819, 827-28 (8th Cir. 2002) (applying South Dakota law and upholding judgment for the plaintiff where the employer manufactured reasons for

38

terminating the plaintiff even though the employer knew that the plaintiff's medical condition made him particularly vulnerable to emotional distress). While no doubt upsetting to Dunn, the School District's nonrenewal of his contract, even if done on an illegitimate basis, was not done in a manner involving extreme or outrageous conduct "calculated to cause" serious emotional distress. Hauff, 668 N.W.2d at 535; see also Reynolds v. Ethicon Endo-Surgery, Inc., 454 F.3d 868, 873-74 (8th Cir. 2006) (applying South Dakota law and stating that "[w]hile termination from a job may be upsetting, this does not in itself constitute extreme or outrageous conduct"); Richardson, 531 N.W.2d at 28-29 (holding that employer's conduct was not extreme and outrageous where employer terminated employee and had her escorted out of the building but did not raise his voice or use profanity when doing so).

As for Eppard's response to the EEOC, Dunn's contention that Eppard created this document to damage his character and that the statements therein have "no supportive evidence" is not borne out by the record. Eppard created this document as a response to the EEOC and not as an effort to defame or disparage Dunn. Although Dunn disagrees with Eppard's assessment of his performance and has offered contrary evidence, he has not shown that Eppard's statements were so patently false or derogatory that they exceeded "all possible bounds of decency[.]" See Harris, 653 N.W.2d at 500.

Finally and contrary to Dunn's argument, neither the remaining conduct he points to nor the School District's conduct as a whole make this case similar to Hayes v. Northern Hills General Hospital, 590 N.W.2d 243 (S.D. 1999). In Hayes, the Supreme Court of South Dakota found a question of fact concerning whether the defendant's harassment of the plaintiff—which included placing him on emergency room call twenty-four hours a day seven days a week,

mistreating his patients, manipulating his mail, tampering with his patient charts, and singling him out for review before a committee—constituted extreme and outrageous conduct. Id. at 251. Such a level of harassment is simply not present here. In sum, no material question of fact exists on the first element of Dunn's intentional infliction of emotional distress claim because the School District's conduct was not sufficiently extreme and outrageous as a matter of law to justify allowing the claim to proceed. Accordingly, the School District is entitled to summary judgment on Count III of Dunn's Amended Complaint.

## V. Conclusion

For the reasons states above, it is hereby

ORDERED that the School District's Motion for Summary Judgment, Doc. 41, is granted in part and denied in part, being denied on Count I but granted on Counts II and III.

Dated August 4ᵗʰ, 2014.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

40